**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| TAWANA SCRUGGS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No. |
| | ) | |
| CITY OF ST. LOUIS | ) | |
| OFFICER RYAN MURPHY, | ) | |
| individually and officially, of the St. | ) | |
| Louis Police Department | ) | |
| SAM DOTSON, officially and | ) | |
| individually, | ) | |
| Defendants. | | |

## COMPLAINT

COMES NOW Plaintiff Tawana Scruggs as mother of Jorevis Scruggs (deceased), by and through his attorneys, The Legal Solution Group, LLC and Kingdom Litigators, Inc. A Public Interest Law Firm and complaining of the Defendants, City of St. Louis a municipal corporation, Sam Dotson, Ryan Murphy, each of them and in the alternative, states the following:

## INTRODUCTION

On April 19, 2016, Officer Streckfuss and Defendant Murphy shot and killed 15-year-old Jorevis Scruggs because Mr. Scruggs ran and refused to stop. The Defendant acted according to the SLMPD's custom and practice "you run you pay." The Defendants ignored, concealed and resolved incidents in this custom using the City's Rec & Normal policies and practices which required anyone charged with a municipal resisting arrest offense to sign a release requiring silence.[1] As a result, Mr. Scruggs like many before and after him, was wrongfully killed and

---

[1] Related lawsuits pending consoldiation: *Jamal White v. City of St. Louis et al., 18-cv-00518; Mansur Ball-Bey v. City of St. Louis et al., 18-cv-01364; Lakenia Mahdi v. Julian Bush et al., 19-cv-00183.*

deprived of his constitutional rights because no one ever reviewed the executed agreements which concealed a custom of police misconduct.

As the City of St. Louis Municipal Attorney Manager— who, after a decade finally refused to issue charges against 150 people and the City could not obtain executed releases and were sued recently said, —*I'm sure the [City Attorneys] that are handling those [] lawsuits wish I would have brought charges, though. Tell the police to quit killing people - that's my answer*. Unfortunately for Jorevis Scruggs, he was killed before the Attorney Manager's moral awakening and the custom was already out of control. Against this backdrop, Plaintiff filed her action as the mother of Jorevis Scruggs.

## JURISDICTION

1.      Federal jurisdiction is proper pursuant to 28 U.S.C. §1331 because of Plaintiff's claimed constitutional violations pursuant to 42 U.S.C. §1983 against Defendants.

2.      Venue in the Eastern District of Missouri- Eastern Division is proper pursuant to 28 U.S.C. §1391 because the April 19, 2016 incident described herein occurred within this district and all defendants reside within this district.

## PARTIES

3.      Plaintiff, TAWANA SCRUGSS is, and at times relevant was, a citizen of the United States and a resident of St. Louis, Missouri and the biological mother of JOREVIS SCRUGGS.

4.      Defendant, City of St. Louis (the City) is a municipal corporation in the state of Missouri. In addition, Defendant Sam Dotson Jr. is the current police commissioner and officially represents the City of St. Louis Metropolitan Police Department.

2

5.     Defendant Ryan Murphy is an employee and police of the City of St Louis and at all relevant times responsible for the conduct alleged herein.

## FACTS

6.     On or about April 19, 2016, Officer Streckfuss and Defendant Murphy were following a vehicle they alleged was involved in an earlier criminal offense all though the vehicle was not driving at a high rate of speed.

7.     As the vehicle came to a stop at St. Louis Ave., the Plaintiff, a 15 year old minor at the time, exited the vehicle and began to run through an alley.

8.     Plaintiff was not armed with any weapon and did not present a threat to Defendant Murphy or Officer Streckfuss.

9.     Nonetheless, before Officer Streckfuss stopped his vehicle, Defendant Murphy exited the passenger side door and started shooting at the Plaintiff as he ran.

10.    Plaintiff continued to run down the alley and a left at the intersection. Officer Streckfuss allegedly yelled at Defendant Murphy to cease firing because Officer Streckfuss was in the line of fire.

11.    Officer Streckfuss then observed the Plaintiff run back across the alley along a fence Defendant Murphy fired again at the back of Plaintiff and, Plaintiff collapsed on the ground from multiple gunshot wounds to his back.

12.    Plaintiff was not armed at the time he was shot.

13.    At all times mentioned, Officer Streckfuss and Murphy were acting under the color of the statutes, ordinances, regulations, customs, and usages of Defendant City of St.

Louis and the State of Missouri and under the authority of their respective office as police officers.

14.   Specifically, Defendant Murphy was driven, motivated, and protected as a direct result of Defendant Dotson's 'Rec & Normal' policies and practices.

## BACKGROUND POLICIES

**a.**   **Rec & Normal Policies and Practices are the Driving Force behind SLMPD's widespread and persistent tyrannical practices.**

20.   Over the past century, Defendants have enforced a blanket mandatory policy and practice to require individuals accused of "resisting arrest" in municipal court to sign a document which releases the accused defendant's civil rights in exchange for a municipal prosecutor's recommendation to dismiss or amend violation of Muni code 15.10.10.

21.   The written policy (also known as the "Rec") states in pertinent part:

> [3.] "Resisting arrest & Interfering with a Police Officer charges cannot be amended without first obtaining a signed release from the defendant (See Sample)." (no emphasis added).

22.   As a result of the Rec policy, the SLMPD updated its special orders in 2012 directing SLMPD Officers to "normally charge" municipal resisting arrest over the state offense municipal resisting arrest. The written policy, also called the "Normal policy," states in pertinent part:

> C. CHARGING OF DEFENDANT

4

> 1. Under normal circumstances, the defendant will be charged with a city ordinance violation of resisting arrest or interfering with an officer. The information application will be made at the City Counselor's Office.

23. Together, the Rec & Normal practices and policies directly and indirectly motivated SLMPD officers to use excessive force or make false arrests with the protection of the City of St. Louis municipal courts. The shield, whether individually known to each SLMPD officer, was embedded in SLMPD training policies and practices.

24. As a standard practice, prosecutors escort unrepresented Defendants into the hallway and explain that the prosecutor will dismiss or amend the charge if the accused signs a blank form entitled, "Release." Generally, the prosecutors complete the remaining lines of the form and accused Defendants have only seconds to decide to release his rights or face up to 90 days in jail.

25. The Rec & Normal practices and policies caused and concealed a widespread pattern of civil rights abuses throughout the City of St. Louis. The civil rights abuses began with simple unlawful searches or excessive use of force incidents and because the Rec & Normal fostered indifference, the civil rights abused escalated to illegal arrests and unjustified deadly force.

26. Today, the Rec & Normal policies and practices have established a tyrannical culture by the SLMPD throughout the City of St. Louis. Regardless of whether you present a physical threat, if you run, protest or walk away from an officer trained by the SLMPD, the officer will use excessive to deadly force as his/her primary means of detaining you.

27.   The Rec & Normal policies and practice have established widespread systematic patterns of unlawful arrests and searches as retaliation for recording or protesting an officer's misconduct.

**a.   The Sole Purpose and Stated Interest for the "Release for Rec Policy" is to Protect the Defendant from Civil Liability.**

28.   The City Counselor consulted an internal employee who had advanced degrees in marketing and advertising, mass communication and constitutional law, hereinafter, (Consultant -1) to provide an opinion on the release for Rec policy. Consultant-1 was an experienced civil defense attorney who was also a constitutional law professor.

29.   Consultant-1 opined that the Rec policy was an excellent method in protecting the City of St. Louis from lawsuits, as it deterred the accused victims from filing. Consultant-1 ensured that the policy and practices were distributed through the City Counselor's intern guide, and trained new, young, and prospective municipal prosecutors to prosecute with a "civil mindset."

30.   The Attorney Manager for the Municipal Division was promoted to head the municipal prosecutors because of "his civil defense mindset."

31.   When asked about the policy and practices relating to the Rec policy, the City Counselor's senior prosecutors provided the following responses:

a.   *"My attitude is, if his [an accused victim's] case is so strong, you'll [the accused victim] try it here [in municipal court] and win and try it in the civil case and win."*
b.   *"…my whole point, why would I plead down a charge, and potentially be looking at civil liability, I'm not doing myself any favors by doing that."*
c.   *"if it's a clear cut "bogus" arrest, then the defendant shouldn't be asking for a plea, tell em' put it on the docket set it for trial."*

32.   The chief prosecutor of the municipal division stated, he requires a release agreement in every instance to dismiss or amend a case because:

> *I'm coming from 16 years of civil defense, I already know what's coming around the corner. I've had a law license for like 30 years I know what's coming around the corner. So when they put me down here that one of the reasons is it would be good to have someone down here that knows the ins and outs of civil defense. And so, what would you do in a civil defense situation? Would I settle a case without taking a release?... so you gotta realize, I gotta have a civil defense mindset. Even though I'm prosecuting, I'm looking one step ahead as to well, what if I don't prosecute this case.*

33.   The City Counselor Julian Bush, individually, pressured prosecutors to obtain release agreements by issuing municipal charges in a case where Defendants may be held civilly liable.

34.   The Attorney Manager stated that on one occasion he did not issue a case against a homeless individual because he did not believe it was warranted. The City Counsleor, Julian Bush, emailed Prosecutor A advising Prosecutor A that because he did not "issue" the case against the homeless man, the City was being sued.

35.   The Attorney Manager stated that during recent protests, SLMPD officers blocked or "kettled" approximately 150 protestors, where the protestors could not disburse as commanded by the SLMPD. The SLMPD subsequently charged the protestors, but Prosecutor A did not believe he should issue the cases. The Attorney Manager was notified that, as a result, the City of St. Louis received approximately 40 lawsuits, and he was certain that attorneys in the civil division "wished" that the Attorney Manager had issued the cases.

7

36.  Due to immense pressure from higher ranking members throughout Defendants'
Office, many prosecutors issue cases to obtain the release of civil liability in exchange
for the prosecutor's recommendation as a normal practice. As the Attorney Manager—
who, finally refused to issue charges so the City did not obtain executed releases and
was subsequently sued— said, *I'm sure the people that are handling those lawsuits wish
I would have brought charges, though. Tell the police to quit killing people - that's my
answer*.

c.  **Defendants Knew that Blanket Release Policies and Practices were Unenforceable and
Illegal as a Matter of Federal Law.**

37.  Consultant-1 provided legal consultation and research on the legality of release
agreements. Consultant-1 knew and advised higher officials in the City Counselor's
office on the law, including the U.S. Supreme Court case *Town of Newton v. Rumery*,
480 U.S. 386 (1987) and Eighth Circuit Court of Appeals law in *Wood v. Rhodes*, 994
F.2d 494, 499 (8th Cir. 1993) which required that the prosecutor analyze each release on
a case-by-case basis.

38. Defendants knew and should have known that *Gram v. Newton Police Department,* 6 Fed. Appx. 520 (8th Cir. 2001); *Hudspeth,* 245 F.3d 375 (8th Cir. 2000); *Holmes v. Russell*, 2012 WL 3315165, at *3 (E.D. Ark. Aug. 13, 2012). *Cain*, 7 F.3d 377 (3rd Cir. 1993); *Berry,* 887 F.2d 635 (5th Cir. 1989); *Kinney,* 144 F. Supp. 2d 908 (N.D. Ohio 2001); *Hilfirty v. Shipman* 91 F3d. 573 (3rd Cir. 1996), specifically required and relied upon a prosecutor's discretion using a case-by-case approach. Moreover, federal courts have specifically outlawed blanket policy and practices to obtain release agreements because blanket policies and practices do not meet the public interest requirement articulated in *Town of Newton v. Rumery. (see, Cain v. Darby*, 7 F.3d 377, 383-84 (3rd Cir. 1993)).

### d. Defendants Require Release Agreements Because Accused Victims *Believe* The Releases Are Enforceable.

39. Plaintiffs have not found a single case that Defendants "legally enforced" a Release agreement against a plaintiff in federal court because the Release for Rec policy was not created for its legal effect. Defendants created the Release for its psychological and marketing effects that resulted, and continue to cause, censorship and prior restraints on accused victims, like Plaintiff, to petition the courts for redress of civil rights violations.

40. Since 1987, prosecutors and legal practitioners have been aware of the psychological effects of release agreements. Defendants knew and should have known of these widely known effects. One prosecutor stated the *"effect of releases was largely psychological, although releases were probably unenforceable."*

9

41. That same year, James Fais, Former Chief Prosecutor, City Attorney's Office in Columbus, Ohio, explained, *"the release convinces defendants that there is no legal redress, and they do not go to lawyers."*

42. Renowned Constitutional Law professor from Suffolk University School of Law Michael Avery explained, *"if the person believes in it [The Release], they don't sue; it's like Santa Claus."*

43. Defendants knew and should have reasonably known the Release for the recommendation had strong psychological and marketing effects on accused victims. In fact, upon information and belief, Consultant-1 was chosen to provide his/her analysis on release agreements for its marketing and mass market effect on accused victims.

**e.  Defendant Dotson receives actual notice of police misconduct, but the Rec & Normal policies allowed Defendant Dotson to ignore the patterns of misconduct.**

44. Defendant Dotson learned of the city prosecutor's blanket policy because the executed release agreements are regularly sent back to the SLMPD. In fact, an employee of the SLMPD legal division sent an email to a municipal prosecutor to ensure the municipal division was "still taking releases."

45. The Release specifically states that the Releasor agrees not to sue the SLMPD for injuries sustained during his/her arrest. SLMPD knew and should have known that a pattern of excessive force in resisting arrest cases was pervasive throughout the SLMPD based on the underlying facts and number of release agreements executed for the resisting arrest charge.

46. But for the Defendants' blanket policy and routine nature of delivering executed release agreements, the SLMPD could have investigated the underlying facts precipitating the need for a release. Instead, the Defendant ignored the underlying facts and considered the case closed simply because the SLMPD had an executed release agreement from the accused victim not to bring a claim against the SLMPD officer(s) involved in the arrest.

**f.  The Rec & Normal Policies and Practices Caused and Concealed Widespread and Systemic Patterns of Police Misconduct.**

47. Plaintiff defines SLMPD's widespread police misconduct as tyrannical practices including (1) the use of excessive and unjustified deadly force when the accused victim runs, pulls away, or protests and (2) unlawful arrests to search and destroy evidence.

48. The illustrative examples of SLMPD widespread tyrannical pattern and practices between 2013 through the present demonstrate an evolution from, how the SLMPD discharged his weapon when an offender ran and charged the offender with resisting arrest, which escalated without supervision into using excessive force when the offender ran as a general practice. These pattern cases include, but are not limited, to the following:

- SLMPD Officer Marcus Biggins discharged his weapon on two separate occasions then charged the suspect with resisting arrest in violation of Muni Code. 15.10.10 and Defendants' Rec policy required a release of civil rights. The suspect was not a threat. The officer reported there were no injuries.

- SLMPD Officer Colin Dowd discharged his weapon and charged the suspect with resisting arrest in violation of Muni Code. 15.10.10 then Defendants' Rec policy required a release of civil rights. The suspect was not a threat. The officer reported there were no injuries.

11

- SLMPD Officer Brendan Whitted discharged his weapon and charged the suspect with resisting arrest in violation of Muni Code then Defendants' Rec policy required a release of civil rights. 15.10.10. The suspect was not a threat. The officer reported there were no injuries.

- SLMPD Officer Dereck Phillip discharged his weapon and charged the suspect with resisting arrest in violation of Muni Code. 15.10.10, then Defendants' Rec policy required a release of civil rights. The suspect was not a threat. The officer reported there were no injuries.

- SLMPD Officer Ryan Linhorst discharged his taser several times striking a suspect both times because Officer Linhorst claimed "he was in fear for his safety. Officer Linhorst charged the accused victim in violation of Muni. Code. 15.10.10, then Defendants' Rec policy required a release of civil rights. The suspect made clear to the officer that he would never hurt the officer and was not a threat.

- SLMPD Officer Joseph Bell seized and arrested three black men because the three men were standing on the sidewalk speaking to each other. When Officer Bell decided to interview them, the three black men walked away. SLMPD Officer Bell did not have reasonable suspicion or probable cause to arrest the three, non-threatening boys. SLMPD Officer Bell charged the suspects in violation of Muni. Cod. 15.10.10, then Defendants' Rec policy required a release of civil rights.

- SLMPD Officer Ryan Linhorst arrested a black female sitting in a chair on the sidewalk because, as Officer Linhorst drove past, the black woman stood up and walked away. Officer Linhorst charged the accused victim in violation of Muni. Code. 15.10.10, then Defendants' Rec policy required a release of civil rights.

- Officer Marcus Biggins discharged his weapon and charged the suspect with resisting arrest in violation of Muni Code 15.10.10, then Defendants' Rec policy required a release of civil rights. The suspect was not a threat. The officer reported that there were no injuries.

- In *Dennis Ball-Bey v. The City of St. Louis et al.,* Scruggs Ball-Bey ran from a police officer and was fatally shot in the back. Mr. Ball-Bey allegedly resisted arrest under the Muni. Code 15.10.10. Mr. Ball-Bey was unarmed and not a threat.

12

- In, *Vonderitt Meyers v. GCI Security Inc.,* the plaintiff, Mr. Myers ran and resisted the arrest of an off-duty SLMPD officer, which resulted in the officer fatally shooting the Plaintiff in the legs and head. The plaintiff would have been charged with the city ordinance resisting arrest. The off-duty police officer is no longer with the police force. Mr. Meyers was unarmed and not a threat.

- Three friends Anthony Tobias, Brian Davis, and Keyon Bennett were stopped by SLMPD Officer James Zwillings, (partner of SLMPD Officer Jason Flannery, who killed Vonderitt Myers). Mr. Bennett stated he, Anthony and Keyon were all running across a vacant lot and Officer Zwilling pursued them on foot. All three boys heard Officer Zwilling fire his weapon – while their backs were turned and running away. None of the bullets fired by Officer Zwillings struck the boys. The boys were not a threat.

- In, *Antoinette Liggins, on behalf of a minor B.C. v. City of St. Louis et al.,* Eastern District of Missouri, 16-cv-00413, plaintiff was a 16-year old boy and was playing at the playground with his brother. SLMPD Officer Michael Cohen pulled up in his squad car, and the boys started running. SLMPD Officer Michael Cohen discharged his weapon and fired four shots at the boys striking the minor B.C. and permanently paralyzing him.  B.C. did not threaten the officer.

- T.E. was 15-years-old as he walked down the street to exchange video games with his friend. SLMPD officers approached T.E. and T.E. fled, as did all the children. SLMPD Officers Murphy and Streckfuss followed Mr. Edwards and shot him in the back although Mr. Edwards did not threaten the officers. Mr. Edwards survived.  The criminal prosecutor dismissed the charges against T.E. because the officers intended to plead the Fifth Amendment against self-incrimination.

49.   By 2018, the pattern and practices alleged herein were so pervasive and widespread, that SLMPD officers beat their undercover officer, L.H., and claimed that Officer L.H. resisted arrest. In a 2018 federal indictment, the U.S. Attorney alleged:

It was part of the manner and means of the conspiracy that the defendants, **Dustin Boone, Randy Hays,** and **Christopher Myers,** upon learning that L.H. was a fellow SLMPD officer, made false statements regarding their conduct and the conduct of L.H. <u>during the course of the arrest in an effort to justify their use of force on L.H., including falsely claiming that L.H. resisted arrest and was not compliant,</u> despite the fact that LH. was an experienced undercover officer who specifically wore a shirt that revealed his waistband so that he would not be mistaken for being armed during the Stockley protests.

50.   During a recent protest, SLMPD's misconduct was just a systematic continuation of a widespread pattern and practice, as a result of the Rec & Normal policies. For example, *Kristine Hendrix v. City of St. Louis, et al.,* the plaintiff Ms. Hendrix, was a peaceful protester videotaping several officers using their taser on innocent protesters. Suddenly, SLMPD Officer Stephen Ogunjobi saw Ms. Hendrix video recording and tased her. Officer Ogunjobi tased Ms. Hendrix three times without giving a single command. SLMPD Officer charged Ms. Hendrix with violation of Muni. Code 15.10.10 resisting arrest. Ms. Hendrix had the financial means to retain counsel. On the advice of counsel, Ms. Hendrix refused to sign any release agreement. Ms. Hendrix was acquitted. She later filed suit for malicious prosecution.

51.   The common denominator in all these cases is that the accused victim allegedly pulled away, ran, protested or walked away, *e.g.*, resisted arrest. The SLMPD officer used excessive force, including deadly force, and generally, if the accused victim(s) survived, charged him with resisting arrest under muni code 15.10.10.

14

52.    This common denominator explains the MacArthur Justice Center's reaction in *David Witt v. City of St. Louis,* Eastern District of Missouri, 18-cv-01294. Plaintiff, Mr. Witt, was a prominent activist for civil rights and was unlawfully arrested and charged with interfering with a police officer. The officers detained Mr. Witt to gain access to his camera under the auspice that it was criminal evidence. Despite the apparent unlawful nature of the arrest, the municipal prosecutors attempted to force Mr. Witt to sign a "Release" ('Rec'). The MacArthur Justice Center, who represented Mr. Witted, described the process as:

> The City engaged in multiple attempts to negotiate a dismissal of the case with prejudice via a plea deal, or "rec"—including presenting a release of liability form at counsel's first municipal appearance and as a purported condition to any kind of plea deal. A true and correct copy of the release form is attached hereto as **Exhibit C**. The City abandoned the prosecution by *nolle prosequi* on May 22, 2017. [attachment omitted]

53.    Many of the defendants charged in municipal court for resisting arrest and forced to sign Release agreements according to the Defendants' blanket policy were unrepresented, including Unnamed plaintiffs 1-70.

54.    The motivating policies and practices behind the Defendants widespread and systematic illegal practices were and continues to be the Rec and Normal policies and practices originating at the City Counselor's office. Without legal representation, many of the accused victims were pressured and forced to sign the release in exchange for their freedom, even when they were innocent of the facts.

55.   Today, the widespread systemic pattern and practices have resulted in a custom of using unjustified force with impunity in any case that an offender runs, pulls away, or protest. If the officer believes there is civil liability, the SLMPD officer will allege the offender "resisted" in violation of a municipal offense.

56.   Defendant Murphy used unjustified force that caused the death of Jorevis Scruggs as a direct result of the practice and custom "you run you, you pay." Jorevis ran and Jorevis paid with his life.

57.   Defendant Dotson and his predecessor exploits the City's Counselor's unconstitutional Rec policy to deliberately ignore police misconduct, including the practice and custom "you run, you pay." Defendant Dotson tacitly authorized the use of deadly force in non-threatening incidents as a result of the Defendants' Rec & Normal policies and practices.

**COUNT I**
**42 U.S.C. § 1983 - EXCESSIVE FORCE in**
**Violation of Fourth and Fourteenth Amendment**
**of the United States Constitution –**
**(v. Defendant Murphy in his official and individual capacity)**

58.   Plaintiff by reference incorporates the introduction and paragraphs 1-57, as though fully set forth.

59.   At all times alleged herein, Defendant Murphy was employed with the City of St. Louis and acting under color of law including by not limited to the Fourth and Fourteenth Amendment.

60.   At all times alleged herein, Defendant City of St. Louis, by and through the St. Louis Police Department authorized, controlled, and maintained responsibility for Defendant Murphy.

61.   At all relevant times alleged herein, no citizen, officer, or bystander was in imminent fear for their life or serious bodily injury.

62.   The Defendant used objectively unreasonable force when Plaintiff did not pose an imminent threat of death or serious bodily injury to Defendant Police Officer or any other person.

63.   The force used by the Defendant was inappropriate, unwarranted and unjustified.

64.   Defendant Ryan Murphy did not need to discharge his weapon at the Plaintiff to effectuate tan arrest.

65.   No reasonable officer would have believed that deadly force was justified under the circumstances.

66.   Defendant Ryan Murphy never provided any warnings that he would use deadly force.

67.   The conduct of the Defendant, Ryan Murphy constituted excessive force in violation of the Fourth Amendment of the United States Constitution, as incorporated into the Fourteenth Amendment of the United States Constitution.

68.   As a direct and proximate cause of Defendants use of excessive force, the Plaintiff suffered severe injuries.

69.   Defendants used deadly force as a direct and proximate cause of Defendant's Dotson's Rec & Normal policies and practices and, these practices have created a custom of using unjustified deadly force in non-threatening incidents.

70.   Defendant Murphy's conduct was a continuation of Defendants' tyrannical custom to subdue, punish, and retaliate in anger towards citizens run.

71.   The Rec & Normal policies and practices were the motivating force to drive the SLMPD's custom of using excessive force on anyone who resists or "you run you pay."

WHEREFORE, Plaintiff prays for compensatory and punitive damages, Plaintiff further prays for attorney's fees, and costs pursuant to 42 U.S.C. 1988, and any other relief this court deems reasonable and just.

**COUNT II**
**42 U.S.C. § 1983 – FAILURE TO TRAIN & SUPERVISE in**
**Violation of Fourth and Fourteenth Amendment**
**of the United States Constitution –**
**(v. SAM DOTSON, and the CITY OF ST. LOUIS officially)**

72.   Plaintiff by reference, incorporates paragraphs 1-71 as though fully set forth herein.

73.   At all times mentioned herein Defendants were responsible for the hiring, training, supervising, and controlling all police officers of the City of St. Louis, and their use of firearms including, Defendant Murphy.

74.   At the time of the occurrence, Defendant Murphy was acting within the course and scope of his employment with Defendant City of St. Louis.

75.   Defendants' Rec & Normal policies and practices were the motivating and driving policy and practice that resulted in SLMPD's tyrannical practices customs and Defendants' official custom of failure to supervise, inadequate, and failure to train. Defendants specifically acted under the color of statute, custom, usage, law, ordinance and policies, including, the "Rec Policy," which created, promoted, and trained SLMPD to use tyrannical customs, tactics, patterns and practices including:

    a.   A common custom, pattern, and practice of using deadly force to effectuate resisting arrest violations, with no threat to the officer's safety;
    b.   A common custom, pattern, and practice of using unjustified force to effectuate municipal ordinance violations of resisting arrest;
    c.   A common custom, pattern, and practice to conceal, obfuscate, and hide civil rights violations through charging municipal resisting arrest or interference with a police officer;

18

    d.  A common custom, pattern, and practice of using excessive force in violation of the Fourth, Fifth, and Fourteenth Amendments.

    e.  A common custom, pattern, and practice of unlawful search and seizures and charging violation of Muni. Code. 15.10.10;

    f.  A common custom, pattern, and practice to tolerate, overlook, and obfuscate police misconduct in incidents where the alleged offender runs, pulls away, or flees.

    g.  A common custom, pattern, and practice to use deadly force when the offender does not present a threat, but the offender runs, pulls, away, or protest his innocence.

    h.  A common custom, pattern and practice to use excessive force as a means to punish, control, and deter accused victims.

76.  As a direct, substantial and proximate result of the SLMPD tyrannical patterns and practices born from the Defendants' Rec & Normal policies and practices, as alleged herein, Plaintiff was severely injured and deprived of his constitutional rights guaranteed under the Fourth, Fifth, Eighth, and Fourteenth Amendments.

77.   Defendant City of St. Louis was deliberately indifferent in its supervision, training and control, which led to tyrannical practices, customs, and patterns of the SLMPD. Defendant was negligent in its supervision of Defendant Murphy in the following respects:

    a.  Defendant City of St. Louis failed to train Defendant Murphy in the proper use of firearms.

    b.  Defendant City of St. Louis failed to supervise and train Defendant Murphy in their use of department issued firearms and weapons on unarmed citizens who have not committed any crime.

    c.  Defendant City of St. Louis failed to supervise and train Defendant Murphy to stop using force to limit the amount of harm caused when there is no threat to them or others; and

    d.  Defendant City of St. Louis failed to supervise and train Defendant Murphy not to use deadly force on a citizen when the life of Defendant Murphy and others are not in danger.

    e.  Defendant City of St. Louis failed to investigate the underlying incidents establishing the custom "you run, protest, record" you pay.

    f.  Defendant City of St. Louis failed to prevent police misconduct and institute appropriate remedial measure to prevent a pattern of police misconduct.

78. After creating the Rec & Normal policies and practices, Defendants could systemically ignore police misconduct. And, eventually this deliberate ignorance of the underlying police misconduct festering and concealed in each release allowed and tacitly authorized officers to use excessive force with impunity on any individual that ran or protested *e.g.* "resisted."

79. The conduct of Defendants as described above deprived Plaintiff of his right to be secure in his person against unreasonable searches and seizures as guaranteed to him under the Fourth Amendment to the United States Constitution, of his right not to be subjected to any cruel and unusual punishment as secured to him under the Eighth Amendment to the United States Constitution, and his right not to be deprived of life, liberty, or property without due process of law and to be accorded the equal protection of the law as guaranteed to him under the Fourteenth Amendment to the United States Constitution.

80. Defendant City of St. Louis was deliberately indifferent to the obvious need and foreseeable consequence of failing to train, supervise, and control Defendant Murphy and as a result Plaintiff was deprived of life and liberty under the constitution.

81. As a direct and proximate result of the negligent conduct of Defendant City of St. Louis described above, Plaintiff was caused to suffer severe pain and mental anguish. Additionally, the actions of Defendant Murphy caused or contributed to cause Plaintiff to incur medical expenses.

82. The conduct of the City of St. Louis was reckless, malicious, wanton, and willful with Plaintiff's constitutional rights and the award of punitive damages is necessary to

punish Defendant City of St. Louis in its individual capacity and to deter it and others from the same or similar transgressions in the future.

WHEREFORE, the Plaintiff prays for injunctive relief and compensatory damages. Plaintiff further prays for punitive damages that will deter and prevent the Defendant from engaging in this type of conduct in the future. The Plaintiff further prays this honorable Court to enter such other and further relief as the Court deems just and proper, including attorney's fees pursuant 42 U.S.C. § 1988.

## COUNT III– DEFENDANT RYAN MURPHY

### Wrongful Death/Assault & Battery v. Defendant
### (R.S.Mo. §537.080(1) and 516.120))

83.  Plaintiff incorporates each and every allegation in paragraphs 1 through 82 by reference as though fully set forth herein.

84.  36. Plaintiff maintains this action for wrongful death pursuant to R.S.Mo. §537.080(1).

85.  Defendant Murphy intentionally discharged his firearm without justification causing an unreasonable apprehension of harm and death to Plaintiff Jorevis Scruggs.

86.  Defendant Murphy fired his weapon at Plaintiff without justification, intentionally and wrongfully causing the death Plaintiff Jorevis Scrugss.

87.  Defendant Murphy's fatal shooting of Scruggs was done in bad faith and with malice in that they intended to cause injury and done with a wicked purpose.

88.  Defendant Murphy shooting death of Scruggs heretofore described needlessly manifested a reckless indifference to Scruggs's constitution rights under the 4th and 14th amendments to the U.S. Constitution.

89.   As a direct and proximate result of the unlawful conduct of Defendant Murphy described above, Scruggs was caused to suffer severe pain, mental anguish, and an agonizing death. Additionally, the actions of Defendant Murphy caused or contributed to cause funeral and burial expenses. As a result of Scruggs's death, Plaintiff has been deprived of the decedent's valuable services, society, companionship, comfort, instruction, guidance, counsel, training, support, love, affection and income.

90.   Plaintiff is entitled to recover for all damages, including pain and suffering experienced by Scruggs, for which Scruggs would be entitled to claim had death not ensued.


**WHEREFORE**, Plaintiff prays for judgment under Count III against Defendant Murphy for a sum of actual damages that a jury determines to be fair and reasonable and for punitive damages that will deter and prevent the Defendant from engaging in this type of conduct in the future. Plaintiff further prays this honorable Court to enter such other and further relief as the Court deems just and proper.

Submitted: April 19, 2019

Respectfully submitted,


The Legal Solution Group, LLC

By: /s/JermaineWooten MO#59338\
Wootenjlaw1@aoL.com
4144 Lindell Suite 225
St. Louis, MO 63108
314-531-1708 Office


Daniel A. Dailey

22

(pending pro hac vice)
*Chief Federal Litigation Counsel*
**Kingdom Litigators, Inc.**
**A Public Interest Law Firm**
3131 McKinney Blvd. Ste. 600
Dallas, TX 75204
p: (214) 422-9350
ddailey@kingdomlitigators.com
IL Bar: 6312616
www.kingdomlitigators.com